IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| WELLS FARGO FINANCIAL LEASING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NCH HEALTHCARE SYSTEM, INC., <br><br> Defendant. | **No. 4:10-cv-00285 – JEG** <br><br><br> **O R D E R** |

This matter comes before the Court on motion by Defendant NCH Healthcare System, Inc. (NCH) to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or in the alternative, to transfer to the Middle District of Florida, Fort Myers Division pursuant to 28 U.S.C. § 1404(a).  Plaintiff Wells Fargo Financial Leasing, Inc. (Wells Fargo) resists.  The parties have not requested a hearing, and the Court finds no hearing is necessary in the resolution of this matter.  The motion is fully submitted and ready for disposition.

I.    **FACTUAL BACKGROUND**

Wells Fargo is an Iowa corporation with its principal place of business in Des Moines, Iowa.  NCH operates non-profit community hospitals and related healthcare facilities and services primarily located in Collier County, Florida.  Non-party AXSA Document Solutions, Inc. (AXSA) is a Florida corporation that provides "document, software and network solutions." Reimer Aff. ¶ 9 n.1.  Although AXSA is not currently a party in this lawsuit, an agreement between AXSA and NCH is a central issue in this litigation.

On December 12, 2007, NCH and AXSA entered into a twelve-month Value Maintenance Agreement (2007 VMA).  The front side of the 2007 VMA provided that for a 12-month term, AXSA would service and maintain various printers at NCH's facilities and that NCH would make twelve monthly payments of $24,459 to AXSA.  The reverse side of the 2007 VMA contained standard, commercial agreement clauses, which included incorporation, assignment of

rights, and forum selection clauses.  While the front side of the 2007 VMA contained signature blocks, the reverse side contained no signature blocks.  The parties also signed a "contract addendum" (2007 Addendum) outlining the parties' "accountability and responsibilities under the terms of the [2007 VMA] to fully support and provide print device services, support and management of all NCH laser printers covered by our partnership . . . ."  Def.'s App. Ex. A.  NCH CFO Vicki Hale and AXSA Major Accounts Manager Thomas Heller[1] signed the 2007 VMA and the 2007 Addendum.  AXSA provided NCH with fully-executed copies of the 2007 VMA and the 2007 Addendum.

In or before January 2009, NCH and AXSA entered into negotiations for the renewal of the VMA.  On February 2, 2009, Jack Silver (Silver), AXSA Vice President of Sales, sent an email to NCH with an attachment containing the proposed VMA (2009 VMA) and an Addendum to Value Maintenance Agreement (2009 Addendum).  Silver's email indicated that the 2009 VMA was "the same maintenance agreement you had signed in December 2007."  Def.'s App. Ex. C.  The terms on the front side of the 2009 VMA provided that for a term of 39 months, AXSA would service NCH's printers, and NCH would make thirty-nine monthly payments of $18,869.00.  On February 2, 2009, NCH General Counsel Kevin Cooper (Cooper) signed the customer acceptance block on the 2009 VMA, and NCH CIO Susan Wolff signed the delivery acceptance block.

On February 4, 2009, Silver sent NCH a revised draft of the 2009 Addendum.  The Addendum provided as follows:

> This Addendum supplements and amends certain terms of the Value Agreement dated February 2, 2009 between NCH Healthcare System, Inc[.] (NCH) its location(s) in Florida and AXSA Document Solutions Company (AXSA), Inc. Below are the items agreed to, and [if] these terms are contradictory of any terms

---

[1] Heller was later charged in a criminal prosecution for modifying the 2007 VMA from a 12-month agreement to a 60-month agreement and for allegedly forging the signature of NCH's CIO, Susan Wolff.

in the agreement the terms of this Addendum will govern.  All other terms of the
Value Agreement will remain in full force and effect.

Def.'s App. Ex. C.  Paragraphs 8 and 9 of the 2009 Addendum set out the procedure NCH would

follow in the event of performance-related problems.  Paragraph 9 stated,

> If AXSA Document Solutions, Inc[.] fails to maintain the systems as outlined by
> this Addendum; with a 30-day written notice of cancellation NCH Healthcare
> Systems, Inc[.] will be held harmless for all remaining payments and fee's [sic]
> associated with the Value Agreement dated February 2, 2009.  This addendum
> item will [g]overn and specifically dissolve the statement known on the Value
> Maintenance Agreement as "Noncancellable/Irrevocable" and "cannot be
> Canceled or Terminated[.]"

Id.

On February 16, 2009, Cooper signed the 2009 Addendum.  NCH returned the documents

to AXSA and requested that AXSA return to NCH fully-executed copies of the documents.

According to NCH, despite NCH's requests, AXSA never provided NCH with fully-

executed copies of the 2009 VMA or the 2009 Addendum.[2]  In spite of this omission, AXSA

continued to provide services to NCH under the 2009 VMA, and NCH made several scheduled

payments to AXSA.

On June 1, 2009, Wells Fargo and AXSA executed a Bill of Sale and Assignment (Bill of

Sale) assigning the 2009 VMA to Wells Fargo for a purchase price of $662,301.90.  The Bill of

Sale provided inter alia that the assignment did not "include a transfer to, and shall not be

deemed to constitute an assumption by, Wells Fargo of any obligations of [AXSA] with respect

to any Contract."  Pl.'s Ex. B.  Michele Boelling (Boelling) signed the Bill of Sale on behalf of

AXSA.  As of August 17, 2009, NCH knew that the 2009 VMA had been assigned to Wells

Fargo.  According to Wells Fargo, AXSA neither provided nor informed Wells Fargo of the

---

[2] NCH alleges that the first time it received fully-executed copies of the 2009 VMA and
the 2009 Addendum was when NCH received the petition and attachments in this litigation.  The
copy of the 2009 VMA attached to the state court petition includes the signature of Michelle
Boelling (Boelling) accepting on behalf of AXSA on June 1, 2009.

2009 Addendum, which modified terms of the 2009 VMA.  After the assignment of the 2009

VMA to Wells Fargo, AXSA continued providing NCH with printer services.[3]

On September 28, 2009, Reimer sent AXSA a letter listing several items of concern

regarding AXSA's performance of the 2009 VMA agreement and the 2009 Addendum.

Reimer's September 28 letter lists AXSA's president, vice president of sales, and vice president

of service, as well as NCH CIO Susan Wolff as copy recipients, but does not list Wells Fargo as

a copy recipient.

On October 28, 2009, Wells Fargo sent NCH a re-notification letter reiterating that Wells

Fargo held all rights, title, and interest in the 2009 VMA and in the equipment referenced there-

in, that all payments under the 2009 VMA should be remitted to Wells Fargo, and that NCH

must secure Wells Fargo's written authorization before removing any of the equipment refer-

enced in the 2009 VMA or before making any modifications to the 2009 VMA.  As directed by

Wells Fargo's October 28 letter, NCH sent three scheduled payments to Wells Fargo.[4]  However,

NCH paid less than the amount billed, noting on the invoices that the "short pay" was because

"toner [was] purchased outside the program because AXSA is not delivering."  Def.'s App.

Ex. I.

On January 28, 2010, Wolff sent AXSA a letter informing AXSA that pursuant to "item

#9" of the 2009 Addendum and due to AXSA's unacceptable performance, NCH was "providing

written notice that we are canceling this agreement and are to be held harmless of all remaining

payments and fees associated with this agreement."  Pl.'s App. Ex. J.  Wolff's letter listed

---

[3] According to NCH, AXSA's service performance further declined after AXSA assigned the 2009 VMA to Wells Fargo.  While this may be material information in regard to other aspects of this case, it is not material to the motion presently before the Court.

[4] A fourth invoice appears in the record with an invoice date of October 17, 2009.  That invoice contains the same billing address and account number; however, the invoice lists AXSA as the payee.

4

AXSA's president, vice president of sales, and vice president of service as copy recipients but, as with Reimer's September 28 letter, did not list Wells Fargo as a copy recipient.

After sending AXSA the January 28 letter, NCH stopped making scheduled payments due under the 2009 VMA and refused to make payments upon demand.  Wells Fargo, as the 2009 VMA assignee, filed a lawsuit against NCH in the Iowa District Court for Polk County alleging breach of contract.  NCH timely removed the case and filed the present Motion to Dismiss, or in the Alternative, Motion to Transfer.

## II.   DISCUSSION

### A. Lack of Personal Jurisdiction

NCH first argues the Court should dismiss this case pursuant to Rule 12(b)(2) for lack of personal jurisdiction, asserting that Iowa being Wells Fargo's principal place of business is not enough to satisfy due process.

"A federal court in a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1073 (8th Cir. 2004) (quoting Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991)).  Because Iowa's long-arm statute "provides for the broadest expanse of personal jurisdiction consistent with due process," State ex rel. Miller v. Grodzinsky, 571 N.W.2d 1, 3 (Iowa 1997), the Court's analysis is limited to whether the exercise of personal jurisdiction comports with due process.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-472 (1985) (quoting Int'l Shoe

Co. v. Washington, 326 U.S. 310, 319 (1945)).  "To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction. The party seeking to establish the court's in personam jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction."  Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003) (internal citations omitted).  At this early stage in the litigation, "the court must look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party."  Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991) ("While it is true that the plaintiff bears the ultimate burden of proof on this issue, jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing."); see also Brown v. Kerkoff, 504 F. Supp. 2d 464, 488 (S.D. Iowa 2007) (same).

NCH argues that the dispute behind the present lawsuit derives entirely from "events, documents, and witnesses in Florida," and NCH has not had the requisite minimum contacts with Iowa.  Def.'s Br. 6.  NCH, therefore, asserts that filing this case in Iowa based upon Wells Fargo's principal place of business is insufficient to satisfy due process and that because the forum selection clause relied upon by Wells Fargo is unenforceable, this case should be dismissed for lack of personal jurisdiction.

## 1.  Minimum Contacts Analysis

Courts generally conduct a minimum contacts analysis to determine whether a party has sufficient minimum contacts with the forum state such that maintaining the suit will not "offend traditional notions of fair play and substantial justice."  Dever, 380 F.3d at 1073 (quoting

Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996) (quoting

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980))).

Relying on EFCO Corp. v. Norman Highway Constructors, Inc., 606 N.W.2d 297, 299

(Iowa 2000), Wells Fargo argues that a minimum contacts analysis is unnecessary since the 2009

VMA contains a valid forum selection clause.  See also Liberty Bank, F.S.B. v. Best Litho, Inc.,

737 N.W.2d 312, 315 (Iowa Ct. App. 2007) ("Forum selection clauses can constitute sufficient

consent by a nonresident defendant to the exercise of personal jurisdiction by a foreign court.").

"[I]t is settled . . . that parties to a contract may agree in advance to submit to the juris-

diction of a given court, to permit notice to be served by the opposing party, or even to waive

notice altogether."  Norman Highway Constructors, 606 N.W.2d at 299 (quoting Nat'l Equip.

Rental Ltd. v. Szukhent, 375 U.S. 311, 315-16 (1964)).

> The requirement that a court have personal jurisdiction flows not from [limitation on a court's power], but from the Due Process Clause.  The personal jurisdiction requirement recognizes and protects an individual liberty interest.  It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty . . . .
>
> Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.

Id. (alterations in original) (quoting Ins. Corp. of Ire., Ltd. v. Compagnie des Bauxites de

Guinee, 456 U.S. 694, 702-03 (1982)).

The parties acknowledge that personal jurisdiction can be waived through a valid forum

selection clause.  See Dominium Austin Partners, L.L.C. v. Emerson, 248 F.3d 720, 726 (8th Cir.

2001) ("Due process is satisfied when a defendant consents to personal jurisdiction by entering

into a contract that contains a valid forum selection clause." (citing Burger King, 471 U.S. at 472

n.14)).  Therefore, in this case, this Court's personal jurisdiction over NCH turns on the validity

of the forum selection clause.

### 2.  Floating Forum Selection Clause

Paragraph 11 on the reverse sides of both the 2007 and the 2009 VMAs contains the

following assignment of rights clause:

> YOU HAVE NO RIGHT TO SELL, TRANSFER, ASSIGN, OR SUBLEASE
> THE EQUIPMENT OR THIS AGREEMENT.  We may sell, assign, or transfer
> this Agreement without notice.  You agree that if we sell, assign or transfer this
> Agreement, our assignee will have the same rights and benefits that we have now
> and will not have to perform any of our obligations.  You agree that the rights of
> our assignee will not be subject to any claims, defenses or set offs that you may
> have against us.

Def.'s App. Ex. A; Pl.'s App. Ex. A.  Paragraph 15, also on the reverse sides of the 2007 and the

2009 VMAs, contains the following forum selection clause:

> This Agreement shall be deemed fully executed and performed in our home state
> or our assignee's principle place of business and shall be governed by and con-
> strued in accordance with its laws.  If we or our assignee shall bring any judicial
> proceeding in relation to any matter arising under the Agreement, the Customer
> irrevocably agrees that any such matter may be adjudged or determined in any
> court or courts in our home state or our assignee's principal place of business, or
> in any court or courts in Customer's state of residence, or in any other court
> having jurisdiction over the Customer or assets of the Customer, all at the sole
> election of us.  The Customer hereby irrevocably submits generally and uncondi-
> tionally to the jurisdiction of any such court so elected by us in relation to such
> matters.  You waive trial by jury in any action between us.

Id.

"Forum selection clauses are prima facie valid and are enforced unless they are unjust or

unreasonable or invalid for reasons such as fraud or overreaching."  M.B. Rests., Inc. v. CKE

Rests., Inc., 183 F.3d 750, 752 (8th Cir. 1999) (citing M/S Bremen v. Zapata Off-Shore Co., 407

U.S. 1, 15 (1972)).  Wells Fargo argues that the forum selection clause was made in an "arm's-

length negotiation by experienced and sophisticated businessmen," and should therefore be enforceable "absent some compelling and countervailing reason." Best Litho, Inc., 737 N.W.2d at 315 (quoting M/S Bremen, 407 U.S. at 15).[5]

NCH argues the 2009 VMA's forum selection clause, which designates that the VMA would be governed by and construed in accordance with the laws of the assignee's principal place of business, is unenforceable because (1) it was not part of the 2009 VMA that NCH signed, (2) the enforcement thereof was not invoked by AXSA, (3) enforcement would be unjust and/or unreasonable, (4) AXSA fraudulently induced NCH to enter the contract with the forum selection clause, and (5) the forum selection clause is overreaching.

### a. 2009 VMA Forum Selection Clause

NCH argues that the "floating forum selection clause is not part of the agreement between AXSA and NCH and therefore cannot be relied upon by AXSA's assignee to establish jurisdiction." Def.'s Br. 8. Wells Fargo counters that there is ample evidence suggesting that NCH consented to the terms on the reverse side of the 2009 VMA, which contained the assignment and the forum selection clauses, and therefore those clauses are enforceable. For several reasons, the Court agrees with Wells Fargo.

NCH does not deny consenting to the terms on the front *and* reverse sides of the 2007 VMA, a copy of which NCH submits in support of its motion to dismiss. The reverse side of the

---

[5] The Eighth Circuit has noted that "in deciding the enforceability of a forum selection clause, there is some disagreement among the circuits over whether state or federal law applies, and we have yet to adopt a definitive position on the issue." Servewell Plumbing, LLC v. Fed. Ins. Co., 439 F.3d 786, 789 (8th Cir. 2006) (internal citation omitted) (collecting cases). The parties do not argue that the application of either federal or state law would result in a different outcome. See, e.g., id.; Best Litho, Inc., 737 N.W.2d at 315. Thus, for purposes of the current motions, the Court applies federal law. See Servewell Plumbing, 439 F.3d at 789.

2007 VMA contains several clauses, including an incorporation clause, an assignment clause, and a forum selection clause.  The 2009 VMA contains the same clauses.  NCH asserts that during the renewal negotiations, AXSA sent only the front side of the proposed 2009 VMA. However, even if the Court accepts NCH's position that during renewal negotiations AXSA never sent a copy of the reverse side of the 2009 VMA to NCH, evidence in the record demonstrates that the reverse side of that document was, nonetheless, part of the agreement.

Support for finding that NCH gave implied consent to the terms on the reverse side of the 2009 VMA is found in the email exchanges between Silver and NCH during the renewal negotiations.  In his February 2, 2009, email, Silver informed NCH that the attached proposed 2009 VMA was "the same maintenance agreement you had signed in December 2007."  The email goes on to point out changes that had been made to accommodate NCH's various requests.  An examination of the 2007 VMA and the 2009 VMA shows that the two agreements are essentially the same form document and that only the fill-in-the-blanks information appears to be different. Because the 2007 VMA was a two-sided document, Silver's comment to NCH that the *renewal* 2009 VMA was the *same* as the 2007 VMA, informed NCH that the 2009 VMA included both a front and a reverse side.  In this motion, NCH never directly states that it was unaware of the reverse side of the 2009 VMA; instead, NCH argues that the reverse side of the 2009 VMA cannot be part of the agreement because AXSA never sent NCH a copy of the reverse side of the 2009 VMA during the renewal negotiations.  Even assuming that during renewal negotiations NCH did not receive a copy of the reverse side of the proposed 2009 VMA containing the boiler-plate language, the facts that (1) NCH knew that the 2009 VMA was a renewal agreement, (2) Silver informed NCH that the 2009 VMA was "the same maintenance agreement you had signed in December 2007," (3) NCH consented to the terms on the reverse side of the 2007

VMA, and (4) NCH is an experienced business entity, support a finding that NCH assented to the terms on the reverse side of the 2009 VMA.

Next, NCH's argument that the reverse side of the 2009 VMA is not part of the agreement contradicts NCH's defense against Wells Fargo's breach of contract claim.  That is, in defending against Wells Fargo's breach of contract claim, NCH relies on terms contained in 2009 Addendum that modify and/or supplement terms on the front side of the 2009 VMA.  However, the authority to modify or supplement the 2009 VMA comes from the incorporation clause, which, in pertinent part, states,

> You agree to all the terms and conditions contained in this Agreement and any supplement, which together are a complete statement of our Agreement regarding the listed equipment ("Agreement") and supersedes any purchase order or outstanding invoice.  This Agreement may be modified only by written agreement and not by course of performance.

Pl.'s App. Ex. A.  The incorporation clause, as with the assignment and forum selection clauses, is found only on the reverse side of the 2009 VMA.  Accordingly, NCH cannot rely on the provisions of the incorporation clause while maintaining that the reverse side of the 2009 VMA is not part of the agreement.

In addition, AXSA invoked the assignment clause, which also appears on the reverse side of the 2009 VMA.  NCH's acquiescence to AXSA's assignment of the 2009 VMA to Wells Fargo is demonstrated by the several contractual payments NCH made to Wells Fargo after AXSA assigned the 2009 VMA, providing further indication that NCH assented to the terms on the reverse side of the 2009 VMA since the authorization to assign is found only on the reverse side of the 2009 VMA.  Again, NCH cannot acknowledge and acquiesce to certain clauses, namely the incorporation and assignment clauses that *only* appear on the reverse side of the 2009 VMA, while asserting that the reverse side of the 2009 VMA was not part of the agreement.

11

Finally, the terms on the reverse sides of both the 2007 VMA and the 2009 VMA are standard contract provisions.  The incorporation, assignment, and the forum selection clauses therein, appear as paragraphs 1, 11, and 15, respectively.  The assignment and forum selection clauses on the 2007 VMA are identical to the respective clauses on the 2009 VMA.  The only material difference between the 2007 VMA and the 2009 VMA appears on the front side of the VMA in the fill-in-the-blank payment block section.[6]

NCH's final assertion that the Court should find the forum selection clause invalid due to a disparity in the bargaining power between NCH and AXSA merits little discussion.  NCH is a large, not-for-profit corporation that owns and operates two regional hospitals and related healthcare facilities in and around Collier County, Florida.  AXSA is an Orlando, Florida-based corporation that provides document, software, and network solution services in Florida.  The record suggests NCH is as savvy, if not more so, a business entity as AXSA.  Kevin Cooper and Susan Wolff signed the 2009 VMA on behalf of NCH.  Vicki Hale signed a declaration that "Kevin Cooper is authorized to sign [the 2009 VMA] on behalf of NCH Healthcare System Inc." Def.'s App. Ex. K.  Cooper is general counsel for NCH, Wolff is NCH's CIO, and Hale is NCH's CFO; as such, they are all sophisticated business persons.  Neither Cooper, Wolff, nor Hale submits an affidavit attesting that he or she lacked knowledge that there were binding contractual terms on the reverse side of the 2009 VMA.  Instead, in support of its argument that the reverse side of the 2009 VMA is not part of the agreement, NCH submits Reimer's affidavit. Reimer, however, was not a signatory to the 2009 VMA nor is there evidence that Reimer had

---

[6] The Court notes that there are slight differences between the language contained in the incorporation clauses on the 2007 VMA and the 2009 VMA; however, those differences are immaterial to the issue currently before the Court and do not alter the Court's finding that NCH assented to the terms on the reverse side of the 2009 VMA.

authority to sign the VMA.  Reimer being a non-signatory notwithstanding, Reimer does not

attest that NCH lacked knowledge of the reverse side of the 2009 VMA or of the terms contained

therein; rather, Reimer merely avers that NCH never received a fully-executed copy of the 2009

VMA from AXSA.  Therefore, on this record, the Court cannot find that the negotiations of the

2007 VMA or the renewal thereof in 2009 were anything other than arm's-length negotiations

between experienced business entities.[7]

Viewing the evidence "in the light most favorable to [Wells Fargo] and resolv[ing] all

factual conflicts in [Wells Fargo]'s favor," <u>Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE),</u>

<u>Ltd.</u>, 89 F.3d 519, 522 (8th Cir. 1996), the Court finds that based upon NCH's admission that it

consented to the contractual terms on the reverse side of the 2007 VMA, NCH's acquiescence in

2009 to the incorporation clause and its compliance with the assignment clause, both of which

*only* exist on the reverse side of the 2009 VMA, and NCH's business sophistication, NCH has

not presented a compelling reason for this Court to find the forum selection clause unenforce-

able, <u>see</u> <u>Best Litho</u>, 737 N.W.2d at 315.  Thus, at this stage in the litigation, Wells Fargo has

met its burden of making a prima facie showing that this Court's exercise of personal jurisdiction

over NCH comports with due process.

### b.  Invocation of the Forum Selection Clause

NCH next contends the forum selection clause is unenforceable because paragraph 15 on

the reverse side of the 2009 VMA identifies AXSA, not its assignee, as the entity with the "sole

contractual right" to invoke the forum section clause.  In support of this contention, NCH points

out that the first paragraph on the front side of 2009 VMA purports to use "plain English" and

---

[7] The Court's findings regarding enforcement of contractual provision are based upon the limited record provided and are strictly limited to the extent necessary for ruling on this motion.

defines that the words "you" and "your" refer to NCH, and that the words "we," "us," and "our"

refer to AXSA; therefore the phrase "at the sole election of us" in the forum selection clause

necessarily strictly refers to AXSA.

In its entirety, the referenced sentence in the forum selection clause states,

> This Agreement shall be deemed fully executed and performed in our home state
> or *our assignee's principal place of business* and shall be governed by and con-
> strued in accordance with its laws.  If we *or our assignee* shall bring any judicial
> proceeding in relation to any matter arising under the Agreement, the Customer
> irrevocably agrees that any such matter may be adjudged or determined in any
> court or courts *in our home state or our assignee's principal place of business*, or
> in any court or courts in Customer's state of residence, or in any other court have
> jurisdiction over the Customer or assets of the Customer, all at the sole election
> of us.  The Customer hereby irrevocably submits generally and unconditionally to
> the jurisdiction of any such court so elected by us in relation to such matters.
> You waive trial by jury in any action between us.

Pl.'s App. Ex. A (emphasis added).  Thus, when read in its entirety, the forum selection clause

clearly provides that AXSA *or its assignee* can bring a judicial proceeding in AXSA's home

state or the assignee's principal place of business.  See, e.g., Thomas v. Progressive Cas. Ins.

Co., 749 N.W.2d 678, 681-82 (Iowa 2009) ("'In determining whether a policy provision is

subject to two equally proper interpretations, we read the insurance contract "'as an entirety

rather than seriatim by clauses.'" (quoting Cairns v. Grinnell Mut. Reins. Co., 398 N.W.2d 821,

825 (Iowa 1987) (quoting Archibald v. Midwest Paper Stock Co., 176 N.W.2d 761, 763

(Iowa 1970))).

The assignment clause gave AXSA the unilateral right to "sell, assign, or transfer this

Agreement without notice," and that in the event the agreement was sold or transferred, AXSA's

"assignee w[ould] have the same rights and benefits that [AXSA has] now and will not have to

perform any of our obligations."  2009 VMA ¶ 11.  Wells Fargo's October 28 letter to NCH

clearly outlines the assignment as well as Wells Fargo's rights and remedies thereunder.  The

three invoices paid by NCH to Wells Fargo are evidence that NCH recognized Wells Fargo as a

valid assignee to 2009 VMA.  NCH does not contend that the assignment was invalid or fraudu-

lent; rather, NCH argues that like the forum selection clause, the assignment clause is not valid

because NCH never received a fully-executed copy of the 2009 VMA.  As previously discussed,

however, NCH acquiesced to and acknowledged the provisions on the reverse side of the 2009

VMA.  Under Iowa law, an effective assignment transfers the "entire rights under a contract

from the assignor to the assignee so that the assignee assumes not only the benefits of the con-

tract, *but also the rights and remedies*," Pillsbury Co. v. Wells Dairy, Inc., 752 N.W.2d 430, 435

(Iowa 2008) (quoting Ross v. First Savings Bank of Arlington, 675 N.W.2d 812, 817 (Iowa

2004)); therefore, Wells Fargo as AXSA's assignee had all the rights and remedies under the

2009 VMA, including the right to select its principle place of business as the forum for

this litigation.

### c.  Unjust or Unreasonable

NCH argues that the enforcement of the forum selection clause would be unjust or

unreasonable because litigation in Iowa would be inconvenient for witnesses.  However, "mere

inconvenience to a party is an insufficient basis to defeat an otherwise enforceable forum

selection clause." Fru-Con Const. Corp. v. Controlled Air, Inc., 574 F.3d 527, 539 (8th Cir.

2009) (quoting Servewell Plumbing, 439 F.3d at 790).  To avoid the forum selection clause,

NCH must show that proceeding in "the contractual forum will be so gravely difficult and

inconvenient that [it] will for all practical purposes be deprived of [its] day in court." Dominium

Austin, 248 F.3d at 727 (quoting M/S Bremen, 407 U.S. at 18).  "The 'great expense' [a party]

claims it will incur if forced to secure witnesses located [in another state], falls well short of

15

depriving it of its day in court." <u>Servewell Plumbing</u>, 439 F.3d at 790.  NCH has failed to

demonstrate that litigating this case in Iowa would deprive NCH of its day in court.

### d.  Fraud and Overreaching

NCH next contends that AXSA fraudulently induced NCH to enter the 2009 VMA, and

therefore the forum selection clause does not apply.  Wells Fargo argues that the 2009 VMA

contains a "waiver of defense clause," which provides "that the rights of the assignee will not be

subject to any claims, defenses or set offs that you may have against us," Sullivan's Aff., Pl.'s

Ex. A  ¶ 11; and therefore NCH's allegations of fraud against AXSA do not affect the enforce-

ability of the forum selection clause.  NCH counters that the waiver of defense clause, as with

the forum selection clause, exists on the reverse side of the 2009 VMA and therefore is not part

of the agreement.

The Court has already determined that for purposes of the motions currently before the

Court, the reverse side of the 2009 VMA is part of the agreement.  <u>See</u> <u>supra</u> at Part II.2.a.  For

those same reasons, the Court finds the waiver of defense clause is also part of the agreement.[8]

---

[8] Wells Fargo asserts that the waiver of defense clause contained in the 2009 VMA applies
to Wells Fargo as a holder in due course because (1) Wells Fargo paid over $400,000 for the
2009 VMA and thus took the assignment for valuable consideration, (2) NCH has produced no
evidence that the assignment was not taken in good faith, and (3) Wells Fargo took the assign-
ment without actual notice of a claim or defense by AXSA.  NCH counters that the 2009 VMA is
a service contract and not a sales contract; therefore the holder in due course provisions of the
Uniform Commercial Code (UCC) do not apply.
        Contrary to NCH's assertions, the current record is not conclusive evidence that the 2009
VMA was strictly a service agreement.  For example, the "Ownership of Equipment" clause on
the reverse side of the 2009 VMA, which states that interest in the equipment that AXSA
delivered to NCH would be released for the nominal price of $1.00 upon NCH full performance
of the agreement, suggests that the 2009 VMA *was* a sale and/or lease agreement.  <u>See, e.g.</u>,
Iowa Code §§ 554.1201, .1203.  However, because NCH fails to plead facts sufficient to support
its allegation of fraud for purposes of defeating the forum selection clause, the Court need not
determine whether Wells Fargo is a holder in due course.

NCH submits Reimer's affidavit and asserts AXSA's fraudulent inducement of NCH to enter into the 2009 VMA is demonstrated by AXSA's failure to attach the reverse side of the 2009 VMA during renewal negotiations, failure to provide NCH with a fully-executed copy of the 2009 VMA, failure to execute the 2009 VMA until June 1, 2009, failure to list 70 percent of the equipment already owned by NCH in AXSA's assignment agreement with Wells Fargo, inclusion of inconsistent dates on the reverse side of the 2009 VMA, regression in performance after assigning the 2009 VMA to Wells Fargo, failure to provide Wells Fargo with a copy of the 2009 Addendum, and history of employee fraud committed against NCH.

A "forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974).  However, "courts should not allow a defendant, or for that matter a plaintiff, to plead their way out of a forum-selection clause to which they agreed by merely asserting, without offering any evidence, fraud in inducement." Republic Credit Corp. I v. Ficachi, No. 4-04-CV-90246, 2004 WL 3168273, at *3-4 (S.D. Iowa Dec. 2, 2004) (unpublished) (citing Republic Credit Corp. I v. Rance, 172 F. Supp. 2d 1178, 1183 (S.D. Iowa 2001)); see also Scherk, 417 U.S. at 519 n.14 (1974) (rejecting the notion that "any time a dispute arising out of a transaction is based upon an allegation of fraud, . . . the [forum selection] clause is unenforceable.  Rather, it means that . . . [a] forum selection clause in a contract is not enforceable *if the inclusion of that clause* in the contract was the product of fraud or coercion" (emphasis added)).

> To set aside a forum selection clause for fraud, the contesting party must allege that the clause was itself a product of fraud, specify facts supporting claims of fraud, or allege that courts in the designated state would be biased or incompetent or unwilling to apply another state's law if applicable.

17

<u>Wells Fargo Fin. Leasing, Inc. v. Orlando Magic Ltd.</u>, 431 F. Supp. 2d 955, 962 (S.D. Iowa 2006) (citing <u>M.B. Rests.</u>, 183 F.3d at 752-53).

Reimer's affidavit is insufficient evidence of fraudulent inducement[9] to defeat the enforcement of the forum selection clause.  First, Cooper, AXSA's general counsel, not Reimer, executed the 2009 VMA, and therefore Reimer cannot attest to the circumstances surrounding the execution of the 2009 VMA.  Second, as the Court previously found, NCH gave implied consent to the terms on the reverse side of the 2009 VMA as demonstrated by NCH's acquiescence to terms contained therein; NCH consented to the same terms contained on the reverse side of the 2007 VMA; and the NCH officers who negotiated the 2009 VMA were sophisticated.  Third, NCH has not alleged any set of facts demonstrating that the forum selection clause was itself the product of fraud.  Finally, NCH's purported evidence of fraud, including AXSA's listing of inapplicable equipment and dates on the 2009 VMA and AXSA's regression in performance after assigning the VMA to Wells Fargo, may be relevant to other claims and defenses relating to the underlying claims in this case, but it fails to demonstrate fraud.  <u>See</u> <u>Haynsworth v. The Corp.</u>, 121 F.3d 956, 963 (5th Cir. 1997) (citing <u>M/S Bremen</u> and reiterating that "[f]raud and overreaching must be specific to a forum selection clause in order to invalidate it").

NCH's final argument is that the forum selection clause unreasonably "reflects substantial overreaching" because 70 percent of the equipment on the spreadsheet attached to the petition already belonged to NCH at the time the agreement was executed.  NCH further argues that

---

[9] In Iowa, "[t]he elements of a claim of fraudulent inducement are: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage."  <u>See</u> <u>Pender State Bank v. Remington</u>, 777 N.W.2d 128, at *4 (Iowa Ct. App. 2009) (unpublished table decision).

Wells Fargo incorrectly described the agreement at issue as an "Equipment Lease Agreement" and alleges that NCH signed the Acceptance of Delivery indicating that the equipment leased was delivered.

NCH again raises issues that may be pertinent to defenses to the underlying breach of contract claim but have no bearing on the issue of the enforceability of the forum selection clause. NCH has not demonstrated that the forum selection clause itself was the product of fraud or overreaching and has therefore failed to meet the "heavy burden of proof" required to set aside the forum selection clause.  See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593 (1991) (holding that a forum selection clause requiring litigation to be in Florida was not overreaching or unreasonable); Kowalski v. YellowPages.com, LLC, 09-2382, 2010 WL 3323749, at *3 (D.N.J. Aug. 18, 2010) (unpublished) ("When a party asserts overreaching as a defense to a forum selection clause, that party must demonstrate that the forum selection provision itself, and not the entire contract, is a product of overreaching.").

**B.  Transfer Pursuant to 28 U.S.C. § 1404(a)**

NCH argues that even if this Court were to find that "the floating venue selection clause was valid and enforceable, this Court should nonetheless transfer this lawsuit under 28 U.S.C. § 1404(a) to the Middle District of Florida, Fort Myers Division, where the lawsuit might have been originally brought."  Def.'s Br. 10.

The federal transfer statute, 28 U.S.C. § 1404(a), provides, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  A transfer analysis pursuant to section 1404(a) follows a three-factor balancing test: "(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice."  Terra Int'l, Inc. v. Miss. Chem.

19

<u>Corp.</u>, 119 F.3d 688, 691 (8th Cir. 1997).  "District courts are not limited to the factors enumerated in the statute but may consider all relevant factors."  <u>Orlando Magic Ltd.</u>, 431 F. Supp. 2d at 966.  A valid, applicable forum selection clause is "one factor, albeit a very important one, in the overall transfer analysis."  <u>Id.</u> (quoting <u>Terra Int'l</u>, 119 F.3d at 691).  "In general, federal courts give considerable deference to a plaintiff's choice of forum and thus the party seeking a transfer under section 1404(a) typically bears the burden of proving that a transfer is warranted."  <u>Terra Int'l</u>, 119 F.3d at 695.

### 1. Venue in Middle District of Florida

"The initial inquiry in ruling on a motion under § 1404(a) is whether this case might have been brought in the [Middle District of Florida, Fort Myers Division]."  <u>Biometics, LLC v. New Womyn, Inc.</u>, 112 F. Supp. 2d 869, 875 (E.D. Mo. 2000) (quotation marks omitted).  NCH is based in Collier County, Florida, and therefore venue is proper in the Middle District of Florida, Fort Myers Division.  <u>See</u> 28 U.S.C. § 1391.  Wells Fargo does not contest that this case could have originally been brought in the Middle District of Florida, Fort Myers Division.

### 2. Permissive or Mandatory Forum Selection Clause

When determining whether to grant a motion to transfer where there is a forum selection clause, the Court must first determine whether the venue selection in the clause is permissive or mandatory.  "Whether a forum selection clause is mandatory or permissive is a matter of contract interpretation . . . ."  <u>Terra Int'l., Inc. v. Miss. Chem. Corp.</u>, 922 F. Supp. 1334, 1370 (N.D. Iowa 1996).

Relying on <u>GreatAmerica Leasing Corp. v. Telular Corp.</u>, No. C-98-127, 1999 WL 33656867, at *6 (N.D. Iowa Apr. 20, 1999) (unpublished), NCH asserts that if the Court finds

the clause is permissive, the court may, after consideration of the relevant factors, transfer venue from the assignee's home state to the state where the underlying dispute occurred.

In GreatAmerica, the forum selection clause stated, "YOU CONSENT TO THE JURIS-DICTION AND VENUE OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN LESSOR'S OR LESSOR'S ASSIGNEE'S STATE, AND WAIVE ANY OBJECTION RELATING TO IMPROPER VENUE." Id. at *3, 5.  Based upon this language, the GreatAmerica court found that "[t]he clause does not provide for 'exclusive' jurisdiction. Instead, the clause in this case 'falls short of designating an exclusive forum' and states that the parties 'consent' to jurisdiction and venue in the lessor's state or the lessor's assignee's state." Id. at *6 (quoting Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 78 (9th Cir. 1987)).

The forum selection clause in the case at bar states,

> If we or our assignee shall bring any judicial proceeding in relation to any matter arising under the Agreement, the Customer irrevocably agrees that any such matter *may* be adjudged or determined in any court or courts in our home state or our assignee's principal place of business, or in any court or courts in Customer's state of residence, or in any other court have jurisdiction over the Customer or assets of the Customer, all at the sole election of us.

Pl.'s App. Ex. A (emphasis added).  The use of the word "may" in the forum selection clause denotes that the clause does not mandate a particular jurisdiction.  See Fla. State Bd. of Admin. v. Law Eng. & Envtl. Servs., Inc., 262 F. Supp. 2d 1004, 1009-10 (D. Minn. 2003) ("[C]ourts have found that use of the words 'may' and 'should' signify permissive clauses, while use of the words 'shall,' 'will' or 'must' signify mandatory clauses." (collecting cases)).  Having considered the language of the forum selection clause as a whole, the Court finds that the forum selection clause is permissive rather than mandatory and therefore not dispositive on the issue of venue.  See GreatAmerica, 1999 WL 33656867, at *6.

21

### 3.   Convenience of the Parties and Witnesses

In balancing the convenience factor, the Court may consider

> (1) the convenience of the parties, (2) the convenience of the witnesses-including the willingness of witnesses to appear, and the ability to subpoena witnesses, and the adequacy of deposition testimony, (3) the accessibility to records and documents, (4) the location where the conduct complained of occurred, and (5) the applica-bility of each forum state's substantive law.

Terra Int'l, Inc., 119 F.3d at 697.  "Merely shifting the inconvenience from one side to the other . . . is not a permissible justification for a change of venue."  Id. at 696-97 (quoting Scheidt v. Klein, 956 F.2d 963, 966 (10th Cir. 1992)); see Lajaunie v. L & M Bo-Truc Rental, Inc., 261 F. Supp. 2d 751, 754 (S.D. Tex. 2003) (concluding that shifting costs, rather than reducing them, does not support transfer).

NCH argues that Wells Fargo's role in this dispute was "to collect or not collect payments subsequent to the June 2009 Bill of Sale and Assignment, which [NCH] admits it stopped making upon notification of breach and termination to AXSA."  Def.'s Br. 13.  This concession notwithstanding, NCH argues Wells Fargo has no material witnesses whose convenience must be considered, whereas NCH has "dozens of present and former employees of NCH that suffered through the aggravation of inoperable printers and poor performance by AXSA," six of whom were "material witnesses to all aspects of negotiation, creation, execution, performance or breach (by AXSA)" of the 2009 VMA.  Def.'s Br. 13; Reimer Aff. ¶ 35.  NCH further argues that NCH considers ten present or former AXSA employees "material to all aspects of negotiation, creation, execution, performance or breach (by AXSA)" of the 2009 VMA.  Def.'s Br. 14.  NCH further avers that the NCH and AXSA employee and former employee witnesses presumably live in or around the Middle District of Florida, and none are under any obligation to testify. NCH emphasizes that the issue of fraud makes live testimony of those witnesses particularly

important because "credibility matters more." and the fact-finder needs to be able to assess credibility.  Id.

Relying on Medicap Pharmacies, Inc. v. Faidley, 416 F. Supp. 2d 678, 687-88 (S.D. Iowa 2006), Wells Fargo counters that NCH's unspecified allegations of witness inconvenience are insufficient to carry NCH's burden to justify transfer.  Wells Fargo counters that the same convenience considerations make Iowa the most convenient forum for Wells Fargo's witnesses since Iowa is Wells Fargo's principal place of business, the original contract documents are in Iowa, communications and payments were directed to Wells Fargo in Iowa, Wells Fargo filed suit to recover money damages owed in Iowa, and numerous Wells Fargo employees that may be called to testify are located in Iowa.  Wells Fargo also proffers that there are alternative means of procuring the testimonies of the NCH and AXSA witnesses, making live testimony unnecessary.

The Court "must examine the materiality and importance of the anticipated witnesses' testimony and then determine their accessibility and convenience to the forum."  Reid-Walen v. Hansen, 933 F.2d 1390, 1396 (8th Cir. 1991) (citing Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1335-36 (9th Cir. 1984)).  "The burden is on the defendant to provide these facts by way of affidavit or other information."  Id.

In Medicap Pharmacies, the Court noted that in support of transfer based upon the inconvenience to non-party witnesses, the defendant merely "attempted to identify relevant testimony to be given by unnamed witnesses."  Medicap Pharms., 416 F. Supp. 2d at 687-88.  The court reasoned that "[t]he convenience of non-party witnesses is generally considered to be one of the most important factors to be weighed in the venue transfer analysis," and that "[t]he party seeking the transfer must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover."  Id. at 687.  The court found that the

defendant's failure to name any potential witness and speculative testimony unnamed witnesses would likely provide was insufficient to carry the defendant's burden on the convenience of witnesses factor.  Id. at 687-88.

In contrast, in the present case, NCH has identified various non-party witnesses, including Silver, Boelling, and Heller, their roles at AXSA, their knowledge of the 2007 and 2009 VMAs and Addendums, their anticipated testimonies, and the materiality and importance of those anticipated testimonies.  Wells Fargo argues that the testimonies of NCH's non-party witnesses are not essential because those witnesses have no knowledge of the conduct underlying Wells Fargo's breach of contract claim against NCH or NCH's alleged failure to make required payments to Wells Fargo.

By contrast, Wells Fargo refers to its own list of non-party witnesses, which includes several employees' names along with generic job descriptions, and merely suggest that those employees all reside in Iowa and "have information and knowledge relevant to this matter." Sullivan Aff. ¶ 3.  Wells Fargo does not provide those witnesses' proposed testimonies.  Because NCH concedes that it stopped making payments to Wells Fargo, the unspecified testimonies of some, if not all, of Wells Fargo's witnesses, may be unnecessary.  On the other hand, NCH's admission that it stopped making payments to Wells Fargo does not alter NCH's burden of demonstrating its purported defense, that is, the validity of the cancellation provisions in the 2009 Addendum.  The 2009 Addendum was negotiated, formed, and executed in Florida. Because NCH's defense is based upon the provisions contained in that addendum, it is highly probable that NCH will subpoena the proposed non-party witnesses.

On a motion to transfer venue, the Court will not opine as to the relative strengths or weaknesses of NCH's defense to the underlying claims in the case; however, it is incumbent

upon the Court to consider the materiality and importance of anticipated testimony.  See

Reid-Walen, 933 F.2d at 1396.  The Court tends to agree with NCH that its non-party witnesses'

testimonies will be important to NCH's defense in this case, and for purposes of weighing

credibility, the live testimonies of those witnesses is preferable.  Further, the Court recognizes

the limits of its subpoena power to secure the testimonies of non-party witnesses located in

Florida.  See Fed. R. Civ. P. 45(b)(2) (stating that "a subpoena may be served at any place:

(a) within the district of the issuing court; [and] (b) outside the district but within 100 miles of

the place specified for the deposition, hearing, trial, production, or inspection . . . .").

Given NCH's admission that it stopped making payments to Wells Fargo, the testimonies

of Wells Fargo employees confirming that NCH stopped making payments appears to be

redundant.  Thus, the relevant conduct still in dispute in this case occurred in Florida, which is

where all non-party witnesses are purportedly located.[10]  Accordingly, the Court finds that NCH

has demonstrated that the comparative convenience of the parties and non-party witnesses

weighs in favor of transfer.  See Rogers v. Wyeth, Inc., No. 08-2149, 2010 WL 3324432, at *1

(D. Minn. Aug. 20, 2010) (unpublished) (concluding the convenience of the parties and

witnesses weighed in favor of transfer out of Minnesota to plaintiff's home state of Georgia

because no parties or witnesses were located in Minnesota, none of the relevant events or alleged

---

[10] Wells Fargo faulting NCH for its inability to do more than state that the non-party witnesses "presumably" still live in or around the Middle District of Florida is duplicitous since Wells Fargo has done the same on its own proposed witness list.  At this stage of the litigation, prior to discovery, the parties are not expected to provide definitive locations for their proposed witnesses.  NCH's belief that the witnesses it expects to subpoena are located in the Middle District of Florida is not based on sheer speculation since those witnesses worked for either AXSA or NCH and were located in or around Collier County, Florida, as recently as 2009.  Furthermore, there is absolutely no evidence that any of NCH's proposed witnesses are, or ever were, located in the state of Iowa.

injuries occurred in Minnesota, and none of the evidence was present in Minnesota); <u>Aviva Life</u> <u>& Annuity Co. v. Goldstein</u>, __ F. Supp. 2d __, 2010 WL 2747274, at *8 (S.D. Iowa July 13, 2010) (denying defendant's motion to dismiss under Rule 12(b)(2) for lack of personal juris-diction and under Rule 12(b)(3) for improper venue, but granting defendant's motion to transfer the case from the Southern District of Iowa to the Southern District of Texas pursuant to § 1404, finding that extensive testimony from non-party witnesses located in Texas would be necessary to the underlying issue in the case making the Iowa forum inconvenient and outside the court's subpoena power).

### 4.  Interests of Justice

"Relevant, and somewhat overlapping, factors" courts consider in evaluating whether the interests of justice warrant transfer include "(1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgement, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) the advan-tages of having a local court determine questions of local law." <u>Terra Int'l</u>, 119 F.3d at 696.

NCH argues that "this case will involve at least two lawsuits if this case is not transferred to Florida,"[11] Def.'s Br. 15; and because separate lawsuits allow for potential discrepancies between Florida and Iowa courts' interpretations of the NCH-AXSA agreement, judicial economy favors transfer of this lawsuit to Florida where the lawsuits could be consolidated. NCH further argues that comparative costs favor transfer because at some point NCH will find itself litigating in Florida.  In regard to the ability to enforce a judgment, NCH argues that this

---

[11] NCH identifies the present lawsuit, a lawsuit between NCH and AXSA, and third potential lawsuit between Wells Fargo and AXSA.

factor should be at least neutral since Wells Fargo would not be disadvantaged by a judgment obtained in Florida.

In response, Wells Fargo argues Iowa is the favored forum because "[c]onsiderable deference is to be given to a plaintiff's choice of forum, even absent the presence of a valid forum selection clause," <u>Medicap Pharms.</u>, 416 F. Supp. 2d at 688, and that there is no disparity in the comparative costs to the parties of litigating in each forum.  Moreover, Wells Fargo argues the conflict of law factor disfavors transfer because it is advantageous to have a federal court sitting in Iowa apply Iowa law.  Wells Fargo denies that multiple lawsuits will result if NCH determines AXSA is a necessary party because this Court has jurisdiction over AXSA based upon AXSA's contractual activities directed at the state, and therefore NCH can file a third-party complaint against AXSA in this same action.  Wells Fargo further asserts that there is no reason to believe at this stage that AXSA would resist litigating this matter in Iowa.

Should it be determined that Iowa law applies to the underlying breach of contract claim in this case, a federal court sitting in diversity in Florida is competent to apply Iowa laws to the parties' claims and defenses.  Transfer of the case to the Middle District of Florida will not impede the parties' ability to add AXSA as a party since AXSA is subject to personal jurisdic-tion in that district.  As previously noted, given NCH's admission that it stopped making pay-ments to Wells Fargo, NCH's defense for its conduct appears to be the remaining issue in the case, leaving the comparative costs to the parties in favor of transfer.  Wells Fargo asserts that there is no reason to believe AXSA would resist litigating this matter in Iowa, yet there is like-wise no reason to believe that AXSA, which is located in Florida, *would not* resist litigating a lawsuit brought against it by NCH, which is also located in Florida.[12]  Wells Fargo's choice of

---

[12] Wells Fargo has not postulated a present intention to bring an action or claim against AXSA.

27

forum weighs against transferring this case; however, that consideration is juxtaposed by the fact that Florida has an equal, if not greater, interest than Iowa in providing a venue for the claims, counterclaims, and/or third-party claims involving two Florida businesses.

The Court finds that because the potential for multiple lawsuits over the issues in this case is more real than speculative, and because judicial economy favors NCH's ability to file a third-party claim against AXSA if this case is transferred to Florida, the interest of justice factor weighs in favor of transfer.

The Court concludes that on balance, the convenience of parties, the convenience of witnesses, and the interest of justice weigh in favor of transferring this case to the Middle District of Florida.

## III.   CONCLUSION

For the reasons stated, Defendant's motion to dismiss for lack of personal jurisdiction (ECF No. 3) must be **denied**, and Defendant's Alternative Motion to Transfer Venue must be **granted**.  The Clerk of Court is directed to transfer this case to the Middle District of Florida, Fort Myers Division.

**IT IS SO ORDERED.**

Dated this 8th day of December, 2010.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT